```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF INDIANA
 2                          SOUTH BEND DIVISION

 3      UNITED STATES OF AMERICA        )  Cause No.:
                                        )  3:16-MJ-00022
 4           vs.                        )
                                        )
 5      ISAIAH DEONTE JOVAN BEAVERS     )  South Bend, Indiana
        also known as                   )  July 13, 2016
 6      ISIAH DEONTE JOVAN BEAVERS,     )
                                        )
 7                Defendant.            )
                                        )
 8      _____ )

 9

10             TRANSCRIPT OF PRELIMINARY/DETENTION HEARING
           (STENOGRAPHICALLY PRODUCED FROM FTR ELECTRONIC RECORDING)
11            BEFORE THE HONORABLE CHRISTOPHER A. NUECHTERLEIN

12
        APPEARANCES:
13
        For the Government:          MR. KENNETH M. HAYS
14                                   United States Attorney's Office
                                     M01 Federal Building
15                                   204 South Main Street
                                     South Bend, IN  46601
16
        For the Defendant:          MR. H. JAY STEVENS
17                                   Federal Community Defenders, Inc.
                                     Northern District of Indiana
18                                   227 South Main Street, Suite 100
                                     South Bend, IN  46601
19

20

21

22
                          Joanne M. Hoffman
23              Federal Certified Realtime Reporter
                   102 Robert A. Grant Courthouse
24                    204 South Main Street
                    South Bend, Indiana  46601
25              Joanne_Hoffman@innd.uscourts.gov
                        (574)246-8038
```

```
 1                              INDEX

 2    WITNESSES:                                      PAGE:

 3    TIMOTHY THERIAULT

 4    DIRECT EXAMINATION
      BY MR. HAYS....................................     4
 5    CROSS-EXAMINATION
      BY MR. STEVENS.................................     6
 6
      JUANELLA BEAVERS
 7
      DIRECT EXAMINATION
 8    BY MR. STEVENS.................................    18
      CROSS-EXAMINATION
 9    BY MR. HAYS....................................    23
      REDIRECT EXAMINATION
10    BY MR. STEVENS.................................    29

11                            * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          COURTROOM DEPUTY:  Cause Number 3:16-mj-22, *USA v.*

2   *Isaiah Beavers*.

3          Would counsel please state your appearance.

4          MR. HAYS:  Kenneth Hays on behalf of the United

5   States, Your Honor.

6          THE COURT:  Mr. Hays.

7          MR. STEVENS:  Jay Stevens on behalf of Mr. Beavers,

8   and Mr. Beavers is present.

9          THE COURT:  Mr. Stevens.

10          This matter is on the Court's calendar for two items.

11   First is a preliminary hearing on the petition -- or, rather,

12   on the Complaint that was filed; and, secondly, a hearing on

13   the government's motion for detention.

14          So first matters first, the preliminary hearing.

15          Mr. Stevens, how do you wish to proceed?

16          MR. STEVENS:  Judge, we're prepared to proceed to

17   preliminary hearing.

18          THE COURT:  All right.  Very well.

19          Mr. Hays.

20          MR. HAYS:  The government calls Agent Timothy

21   Theriault.

22          THE COURT:  All right.  Please come around.

23          Before getting situated, turn, face the clerk, raise

24   your right hand, and the clerk will please swear the witness.

25          (The witness was duly sworn.)

1          THE COURT:  All right.  Now get comfortable in the

2    chair.  You might have to adjust the mike.

3          When you're all in there, state your name, and spell

4    your last name, please.

5          THE WITNESS:  Timothy Theriault.  Last name is spelled

6    T-h-e-r-i-a-u-l-t.

7          THE COURT:  All right.  You may proceed, Mr. Hays.

8                    **TIMOTHY THERIAULT,**

9    having been duly sworn, was examined, and testified as follows:

10                    DIRECT EXAMINATION

11   BY MR. HAYS:

12   **Q.**   Where do you work, sir?

13   **A.**   I'm employed by the FBI.

14   **Q.**   In what capacity?

15   **A.**   I'm a special agent.

16   **Q.**   Are you the case agent in the case against Mr. Beavers?

17   **A.**   Yes.

18   **Q.**   On Saturday of this past week -- I believe that would be

19   the 9th -- did you sign an affidavit in support of probable

20   cause for a Complaint that was issued by the Court?

21   **A.**   Yes.

22   **Q.**   Have you reviewed that since that day?

23   **A.**   Yes.

24   **Q.**   And as you sit here today, do you affirm all of the

25   statements that were made in that affidavit?

1  **A.**   Yes, I do.

2  **Q.**   Another topic beyond that, sir.

3         Was Mr. Beavers arrested on that Saturday?

4  **A.**   Yes, he was.

5  **Q.**   Afterwards, when he was taken into custody, was he asked if

6  he wished to give a statement?

7  **A.**   Yes.

8  **Q.**   Was he given his *Miranda* warnings?

9  **A.**   Yes, he was.

10  **Q.**   Did he agree to waive them?

11  **A.**   Yes.

12  **Q.**   Did he agree to give a statement voluntarily?

13  **A.**   Yes, he did.

14  **Q.**   In that statement, what did he say insofar as his

15  involvement, if any, with respect to the Facebook posts that

16  are at the heart of this charge?

17  **A.**   We discussed his Facebook posts, among other things.  He

18  admitted that he had made the posts under the Facebook name of

19  Thoty Nut, which is his Facebook page.  We showed him some of

20  the Facebook postings, and he admitted that he had put those up

21  there, including the ones that talked about bottles of gasoline

22  and bringing a gun to the Black Lives Matter's rally.

23  **Q.**   Did that also include the very graphic image with the

24  phrase "SPEAK TO COPS IN A LANGUAGE THEY UNDERSTAND"?

25  **A.**    Yes.  He indicated that that was a post that he placed on

```
 1   his Facebook page.

 2           MR. HAYS:  I pass the witness, Your Honor.

 3           THE COURT:  Before you pass, did you confront him with

 4   the specific postings that are indicated in your affidavit?

 5           THE WITNESS:  Yes, sir.

 6           THE COURT:  Did he deny making any of those that were

 7   indicated in the affidavit?

 8           THE WITNESS:  No, he did not deny any of it.

 9           THE COURT:  Did he admit to each of them?

10           THE WITNESS:  He admitted to, I think, the three

11   specific ones that we showed him, yes, sir.

12           THE COURT:  All right.  Do my questions require any

13   followup?

14           MR. HAYS:  No, Your Honor.

15           THE COURT:  All right.

16           Cross.

17                       CROSS-EXAMINATION

18   BY MR. STEVENS:

19   Q.  Agent Theriault, when you talked to Mr. Beavers, did he

20   offer any explanation as to the posts?

21   A.  He essentially said that he was upset with things that had

22   been happening and that he was expressing himself.

23   Q.  And you obtained a Facebook search warrant; is that

24   correct?

25   A.  That is correct.  Well, law enforcement did, yes.
```

1   **Q.**   Law enforcement did.

2   **A.**   Yes.

3   **Q.**   And were any other warrants obtained for his premises or

4   vehicle?

5   **A.**   Not for the premises or the vehicle, no.

6   **Q.**   So you don't have any evidence today as to there actually

7   being any gasoline or bottles or guns at his residence or in

8   his vehicle?

9   **A.**   That's correct.  We did not do a search warrant.

10          MR. STEVENS:  That's all the questions I have, Judge.

11          THE COURT:  Redirect?

12          MR. HAYS:  Nothing further, Your Honor.  Thank you.

13          THE COURT:  All right.  You may step down.

14          Thank you.

15          Any other witnesses?

16          MR. HAYS:  No, Your Honor.

17          The government rests as to the preliminary hearing.

18          THE COURT:  All right.

19          MR. STEVENS:  May I have just a moment, Your Honor?

20          THE COURT:  You may.

21          (Discussion held off the record.)

22          THE COURT:  Any evidence, Mr. Stevens?

23          MR. STEVENS:  No evidence, Judge.

24          THE COURT:  All right.  Any argument?

25          MR. HAYS:  No, Your Honor.

1          THE COURT:  Any argument, Mr. Stevens?

2          MR. STEVENS:  Judge, as far as the last year the law

3     in this circuit was *United States v. Patrick Stewart*, a case I

4     happened to have handled that came out of this district, and

5     the standard at that time was that a threat need only be a

6     threat that a reasonable person would take as a threat.

7          Last year, the Supreme Court significantly narrowed

8     the requirements set for threats in *Elonis v. United States*,

9     E-l-o-n-i-s --

10          THE COURT:  Excuse me.  Say that again, please.

11          MR. STEVENS:  *Elonis v. United States*, E-l-o-n-i-s,

12     135 Supreme Court 2001, and the defendant in that case was

13     charged under a different statute, but it was a statute

14     involving using interstate communications to make a threat.

15          The issue in that case was whether the law in *Stewart*

16     was good law, and the Supreme Court said that the "reasonable

17     person" test was no longer applicable.

18          The defendant in that case made postings on Facebook,

19     and reading from pages 2006 and 2007 of that opinion, the

20     defendant was alleged to have said:

21          "Fold up your [protection-from-abuse order] and put it

22     in your pocket

23          Is it thick enough to stop a bullet?

24          Try to enforce an Order that was improperly granted in

25     the first place

1      Me thinks the Judge needs an education on true threat

2    jurisprudence

3      And prison time'll add zeros to my settlement...

4      And if worse comes to worse

5      I've got enough explosives to take care of State

6    Police and the Sheriff's Department."

7      That was one post.

8      Another post was:

9      "That's it, I've had about enough

10      I'm checking out and making a name for myself

11      Enough elementary schools in a ten mile radius to

12    initiate the most heinous school shooting ever imagined

13      And hell hath no fury like a crazy man in a

14    Kindergarten class

15      The only question is...which one?"

16      Then a third post:

17      "You know your [expletive's] ridiculous when you have

18    the FBI knockin' at yo' door

19      Little Agent lady stood so close

20      Took all the strength I had not to turn the

21    [expletive] ghost

22      Pull my knife, flick my wrist, and slit her throat

23      Leave her bleedin' from her jugular in the arms of her

24    partner

25      So the next time you knock, you best be serving a

```
 1     warrant
 2          And bring yo' SWAT team and explosives expert while
 3     you're at it
 4          Cause little did y'all know, I was strapped wit' a bomb
 5          Why do you think it took me so long to get dressed with
 6     no shoes on?
 7          I was jus' waitin' for y'all to handcuff me and pat me
 8     down
 9          Touch the detonator in my pocket and we're all goin'
10     BOOM!
11          Are all the pieces comin' together?
12          I'm just a crazy sociopath that gets off playin' you
13     stupid [expletives] like a fiddle
14          And if y'all didn't hear, I'm gonna be famous
15          Cause I'm just an aspiring rapper who likes the
16     attention
17          who happens to be under investigation for terrorism
18          Cause y'all think I'm ready to turn the Valley into
19     Fallujah
20          But I ain't gonna tell you which bridge is gonna fall
21     into which river or road
22          And if you really believe this [expletive]
23          I'll have some bridge rubble to sell you tomorrow
24     BOOM! BOOM! BOOM!"
25           The Supreme Court reversed that conviction.  They
```

1    reversed that conviction because the jury was not required to

2    conclude that the individual actually intended a threat.  The

3    objective standard, the "reasonable person" standard, no longer

4    applies, and there has to be evidence that a person intended a

5    threat.

6          There is no evidence that Mr. Beavers possessed a gun.

7    There is no evidence that he possessed a bottle.  There is no

8    evidence that he possessed gasoline.  There is no evidence that

9    he had any intent to carry out any threats.  There is no

10   evidence that this is any more than anger-speak.  And the

11   Supreme Court says there has to be more than that in order to

12   find an individual guilty.

13         THE COURT:  Well, let me ask you:  Does the Supreme

14   Court say that there has to be more evidence to convict or more

15   evidence even to charge than what's before the Court now?

16         MR. STEVENS:  Well, Judge, the defendant in that case

17   moved to dismiss the indictment.  That motion was denied.  The

18   Supreme Court remanded for further proceedings.

19         THE COURT:  So the defendant was not found guilty?

20         MR. STEVENS:  The Supreme Court remanded for further

21   proceedings, so they did not reverse the conviction and order a

22   judgment of acquittal there.  They remanded it for further

23   proceedings, which presumably would include a reconsideration

24   of the motion to dismiss the indictment as well.

25         THE COURT:  All right.  But you would understand or

1    would agree that there are two different standards, that is to

2    say, whether there is sufficient evidence to convict and

3    whether a jury was improperly charged as to what the amount of

4    evidence would be to sustain a conviction, and whether there is

5    probable cause the defendant engaged in conduct that could

6    violate the statute?

7            MR. STEVENS:  I would agree, Judge, that there's a big

8    difference between some evidence, which is all probable cause

9    requires, and proof beyond a reasonable doubt, which is

10   necessary to convict, but there must be evidence as to each

11   element of the charge.

12           THE COURT:  All right.  So you're saying that there

13   must be some evidence for probable cause; and in this

14   particular case here now, there's no evidence to show that

15   element of intent?

16           MR. STEVENS:  That's my argument, Judge.

17           THE COURT:  Okay.  All right.  I just wanted to make

18   sure I understand it.

19           Mr. Hays.

20           MR. HAYS:  Thank you, Your Honor.

21           Judge, the *Elonis* case, as I recall it, is essentially

22   a mens rea case.  In that case, the United States Supreme Court

23   sent the case back because it concluded that under the jury

24   instructions that had been given at the district court level

25   the defendant could have been convicted on a mere --

 1          THE COURT:  So there was a conviction?

 2          MR. HAYS:  That's my recollection, Judge, but,

 3    frankly, I have not read it for several days, so I could be

 4    wrong about the exact posture.

 5          But my point was that the jury instructions themselves

 6    were faulty according to the Supreme Court.  Regardless of

 7    whether there was a conviction or whichever, the point is the

 8    jury instructions were faulty.

 9          Today, it is not that difficult to craft jury

10    instructions which do account for the *Elonis* decision.  In

11    fact, as recently as last fall in the Hammond division, in the

12    *Bradbury* case, B-r-a-d-b-u-r-y, a case that was tried before

13    Judge Simon, some very careful jury instructions were issued

14    which ultimately led to a conviction under this same statute.

15    The point is the instructions --

16          THE COURT:  Same statute, threats under the Internet?

17          MR. HAYS:  Yes, exactly.

18          I can't say "under the Internet."  I can say they were

19    interstate, but it was the same statute though.

20          THE COURT:  Okay.

21          MR. HAYS:  The *Elonis* case was an 875(c) case, as I

22    recall.  The concept probably still applies, so I'm not trying

23    to draw that distinction.

24          But my point is that jury instructions can be crafted

25    that will accommodate the Court's holding in the *Elonis*

```
 1   decision.
 2         THE COURT:  Mr. Stevens, you rose twice.  Now is the
 3   third time.  You may be heard.
 4         MR. STEVENS:  Judge, there was a conviction in Elonis.
 5   That conviction --
 6         THE COURT:  Okay.  I would assume that there would be
 7   because that's the procedural posture to get it to the Supreme
 8   Court.
 9         MR. STEVENS:  There was a jury conviction in that
10   case.
11         As to the Bradbury case over in Hammond, Judge Simon
12   issued an order denying the motion to dismiss that indictment.
13   But in that order, he specifically held that the Stewart
14   standard applied, and that a reasonable person would have found
15   a threat in that case; and he said that perhaps the Supreme
16   Court will change the law maybe in Elonis, and those words were
17   (indiscernible).  The Supreme Court did change the law.
18         Mens rea is an element of the offense.  The Supreme
19   Court said even though the statute doesn't specifically mention
20   mens rea, mens rea in this type of a case is implied in the
21   statute itself.  So there has to be at least some evidence of
22   mens rea beyond the mere fighting words.
23         THE COURT:  All right.  Anything further, Mr. Hays?
24         MR. HAYS:  Judge, only to say that I recall reading
25   the docket sheet and many of the pleadings in the Bradbury case
```

1   just yesterday, and Judge Simon in that case specifically

2   ordered briefing by the parties in light of the *Elonis*

3   decision, so I know *Elonis* was considered by the Court at the

4   time the jury trial occurred.

5          And, I'm sorry, I don't know the cause number,

6   Your Honor; but if the Court needs it, I can provide it to the

7   Court's chambers after the hearing.

8          THE COURT:  No, because I think the procedural posture

9   is an important distinction of where we are now.

10          This is not a jury instruction case.  This is, in my

11   view, not a motion to dismiss an indictment case.  This is a

12   case, as Mr. Stevens indicated, as to whether there's probable

13   cause, some evidence to support the charge.

14          I think there's enough evidence to support the charge

15   on probable cause, and you'll get another shot should a grand

16   jury indict because he'll have time then to challenge the

17   statute, but I think that statute does not preclude this

18   prosecution.  I think it gives guidance to this Court on how to

19   craft an appropriate instruction when that instruction comes,

20   if an indictment falls.

21          So I think it would be premature at this juncture of

22   the proceedings to say there's no probable cause, particularly

23   in light of the defendant admitting he made those statements.

24   I've considered the affidavit.  I issued the warrants.  I've

25   heard the agent indicate that the defendant admitted saying

    1    them, and so I'm going to take the totality of the affidavit to

    2    say that there is sufficient evidence -- doesn't need much --

    3    to support the necessary scienter or elements.  And if this

    4    case survives, you may take that up with whatever presiding

    5    judge hears this matter and file appropriate motions or craft

    6    appropriate jury instructions, all right, but I find probable

    7    cause.

    8            Having now found probable cause, I will refer this

    9    matter to the district court for further proceedings, and we

   10    have additional proceedings here, which is the government's

   11    motion for detention.

   12            So, Mr. Hays, how do you wish to proceed on that

   13    matter?

   14            MR. HAYS:  Brief proffer, Your Honor.

   15            THE COURT:  All right.  You may proceed.

   16            MR. HAYS:  In addition to the evidence Your Honor has

   17    already heard from the special agent, both in his testimony and

   18    in his affidavit, I would proffer to the Court the likely

   19    United States guideline-recommended sentence.

   20            Section 844(e) under the guideline book returns to

   21    Section 2A6.1, which calls for a base offense level of 12, an

   22    additional two levels based upon the number of threats; and

   23    without any other adjustments that may be appropriate, it's an

   24    adjusted offense level of 14.

   25            A rough calculation by me of his criminal history, one

1    prior felony conviction where he was sentenced to a term

2    exceeding a year and a month is three criminal history points;

3    his misdemeanor convictions appear to add four more; the fact

4    that he committed the offense while under criminal justice

5    sentence suggests -- calls for two additional points.  I

6    believe that results in nine criminal history points, a

7    criminal history category IV.  If I'm right on that -- and I

8    fully recognize I could be wrong, but that is my honest, best

9    and good faith estimate -- that calls for a sentencing range

10   between 27 and 33 months.

11        That completes my proffer, Your Honor.  It's brief,

12   obviously, but I would rest upon the information Your Honor has

13   heard today as well as the bail report.

14        THE COURT:  You didn't indicate, so I assume the

15   presumption does not apply?

16        MR. HAYS:  Correct, Your Honor, it does not.

17        THE COURT:  All right.  Mr. Stevens.

18        MR. STEVENS:  May I just have a moment, Your Honor?

19        THE COURT:  You may.

20        MR. STEVENS:  The defendant's mother just came in the

21   courtroom, and I have not had a chance to speak with her.

22        THE COURT:  All right.  You may.

23        (Discussion held off the record.)

24        MR. STEVENS:  I'll call Ms. Beavers, Your Honor.

25        THE COURT:  All right.  Please come forward.  Just

1    come forward around here (indicating), but before taking the

2    stand, turn, face the clerk, and she'll swear you in.

3              (The witness was duly sworn.)

4              THE COURT:  I didn't hear you.  I think you said

5    something.

6              THE WITNESS:  I do.

7              THE COURT:  All right.  Now I've heard you.  Go ahead

8    and take the stand.  Try to get comfortable in there.  You may

9    have to adjust the microphone.

10             THE WITNESS:  Sorry.

11             THE COURT:  All right.  Speak up so we can hear you

12   because we're recording these proceedings.

13             State your name and spell your last name, please.

14             THE WITNESS:  My name is Juanella Beavers.  It's

15   spelled J-u-a-n-e-l-l-a, and last name, Beavers, B- -- as in

16   boy -- e-a-v- -- as in Victor -- e-r-s.

17             THE COURT:  Okay.  Thank you.

18             Now, Mr. Stevens.

19                        **JUANELLA BEAVERS,**

20   having been duly sworn, was examined, and testified as follows:

21                        DIRECT EXAMINATION

22   BY MR. STEVENS:

23   **Q.**  Are you related to Mr. Beavers?

24   **A.**  Yes, sir, I am.

25   **Q.**  What's that relationship?

1  **A.**   Biological mother.

2  **Q.**   And how old is he then?

3  **A.**   He's now 26.

4  **Q.**   And where has he lived over the course of those 26 years?

5  **A.**   At home with me.

6  **Q.**   And has he ever lived for any extended period outside of

7  South Bend, Indiana?

8  **A.**   No, never.

9  **Q.**   You also have a daughter living with you; is that correct?

10  **A.**   I have two.

11  **Q.**   And do you work?

12  **A.**   Yes, sir, I do.

13  **Q.**   What hours do you work?

14  **A.**   From 7:00 to 3:30.

15  **Q.**   7:00 in the morning until 3:30 p.m.?

16  **A.**   7:00 a.m. until 3:30 p.m.

17  **Q.**   And Mr. Beavers is currently unemployed; is that correct?

18  **A.**   Yes.

19  **Q.**   Was he working previously?

20  **A.**   He was prior to getting -- previously, he was working.  He

21  was about to get his other job back.  He just had to -- we had

22  to take him up there.  They said that he'd still get it back,

23  but they said we had to bring him up there, and he had to speak

24  with a certain person and bring the information showing that he

25  was incarcerated because he was working when they incarcerated

```
 1   him.
 2   Q.   He was arrested Friday or Saturday?
 3   A.   He was arrested Saturday.  He was at home.
 4   Q.   And prior to that, he was not in custody; is that right?
 5   A.   No, he was not.
 6   Q.   Do you know where he was working prior to his losing that
 7   job?
 8   A.   MAP of Easton.
 9   Q.   And that was factory work, right?
10   A.   Yes, it was.
11   Q.   And it's your understanding that job is available to him
12   now to go back to?
13   A.   Yes, it is.
14   Q.   I want to ask you about his growing up.
15        Was he ever a violent child?
16   A.   No, he wasn't a violent child.  He just -- he always been
17   big for his age.  So when he played, it was like a -- he was
18   overaggressive with it or -- how would you say?  It was harder
19   for -- when he played with the kids, it's like he would push
20   too hard because he's heavy-handed, and he was big and
21   everybody else was very little.
22   Q.   Did he ever appear to be angry either growing up or as a
23   teenager other than the normal angst that teenagers go through?
24   A.   Yeah, other than just normal when they go through the
25   emotions.  You tell them they can't have something and, of
```

1   course, he'd show he was upset, or if he felt something that

2   was unfair, he'd show that he was upset.  But he wasn't, like,

3   extremely aggressively violent unless someone hit him first or

4   kept picking with him, and then it went into that.

5   **Q.**   Over the last several weeks, have you noticed anything

6   unusual in his behavior?

7   **A.**   Over the several weeks, his behavior was normal.  I

8   observed him.  We have a large family, so we keep close knit to

9   those to whom we're aware that have issues or whatever the case

10  may be.  He does have ADHD and bipolar is hereditary in our

11  family as well.

12  **Q.**   If he's released, would he be able to come home and live

13  with you again?

14  **A.**   Most definitely.

15  **Q.**   Do you have any concern at all about his being a threat to

16  himself or any other person?

17  **A.**   No, I do not.  He wasn't even a threat that day.  He was

18  just debating.  We were all at home having a discussion, and I

19  classify it as a debate because him and my other daughter was

20  just over there, and they're my two greatest debaters.  They

21  speak on -- we'll have a sit-down conversation about anything,

22  different subjects, and they voice their opinion about what

23  they feel like.  It's their opinion.  It's just something

24  that's communicated about.

25          But he wasn't leaving the home or attempting to leave

1    the home when they retrieved him.  He was in his underwear.  He

2    didn't even have shoes on.  They took him without a shirt.

3    **Q.**  And you've been around his room and around the premises of

4    the house?

5    **A.**  Every day.

6    **Q.**  Any sign of bottles, gasoline, guns, knives, anything

7    that's dangerous?

8    **A.**  No, sir.  First of all, I don't even allow my grandkids to

9    even play with the toy guns, so that's not even allowed in my

10   home.  Then it was night, and when they came in there, they

11   ransacked the house and they was looking for stuff, and they

12   put me and my daughter in handcuffs; so I watched them go

13   through the stuff, and they didn't find anything so they walked

14   out.

15   **Q.**  And if required, would you be willing to act as the

16   third-party custodian to make sure he came to court?

17   **A.**  Oh, most definitely.  I always would be the one who'd bring

18   him to court.

19   **Q.**  Okay.  You're gone eight hours out of the day.  Are you

20   there the rest of the day?

21   **A.**  No, I'm at home with him.

22          MR. STEVENS:  Okay.  That's all the questions I have,

23   Judge.

24          THE COURT:  All right.  Cross?

25          MR. HAYS:  Please, Your Honor.

```
 1                      CROSS-EXAMINATION

 2   BY MR. HAYS:

 3   Q.   Ms. Beavers, I believe you just said that your son was not

 4   a violent child, but I think you said he was overly aggressive.

 5          Did I get that right?

 6   A.   Okay, well, wrongly expressed.  I was trying to find the

 7   right words --

 8   Q.   Sure.  Go ahead.

 9   A.   -- that when you have a kid that's bigger than the other

10   kids and when they play with each other, that's why I said he's

11   heavy-handed.  So when he played with the other kids, they

12   might simply play ball and he ran and tried to wobble or wiggle

13   or something like that; and when he'd bump them, they'd go far

14   because they're smaller than him.  He's always been a big kid.

15   He was born a big kid.

16   Q.   So he would use that to his advantage essentially?

17   A.   He didn't have to use it for his advantage.  A lot of times

18   he's -- he's more gentle than he is -- what I claimed to have

19   said at first, you know, as far as being aggressive, he's more

20   gentle than that.  That's why I was telling the agents that --

21   I said, "He's a cream puff."

22          That was my way of saying that he's just a big baby.

23   He's just overthinking and overexpressing himself.

24   Q.   Sure.  Do you think maybe it's a little hard for him to

25   exercise some self-control because of the ADHD?
```

1   **A.**   No.  When he was younger, it used to be a problem because

2   he wasn't aware that's what it was, and he had to learn how to

3   control his emotions.  When he felt some type of way, he had to

4   learn that there was different types of ways of doing it, you

5   know, one, two, three, step, count, and all that type of stuff.

6   So they did allow him to take different classes and, you know,

7   allowed him to -- whatever the case may be, you know, but he

8   was the type of kid that teachers all loved.  Even the police

9   officers like him.

10  **Q.**   Did the teachers at Swanson love him when they referred him

11  to the police when he was seven years of age?

12  **A.**   At seven years of age, like I said, everything we was

13  learning about him.  You know, at Swanson, he didn't even stay

14  there that long, if you noticed.  But you've got to get to know

15  him as well.  So it's not that you just -- some teachers just

16  was, like, look, I don't want to even put up with this, or they

17  had a bad day.  And once they got a chance to talk to me, it

18  was another different story.

19  **Q.**   Was he living with you back when he was convicted of

20  possessing a firearm without a license?

21  **A.**   Yes, he was.

22  **Q.**   Okay.  But you don't allow firearms in your house, so he

23  must have had it somewhere else outside of the house?

24  **A.**   It was in the car.  Now, here's the whole theory about

25  that.  They have, like, a street law that, whatever, you don't

1    snitch on somebody.  I'm sure you've probably heard that.  But

2    it was someone else that was in the car with him; they bailed,

3    and he just took the rap.

4    **Q.**  So now you're saying he wasn't guilty of that crime?

5    **A.**  He's guilty because he was in the possession of being in

6    the surroundings.

7    **Q.**  What about the heroin that led to his felony conviction,

8    was he living with you then?

9    **A.**  Okay.  At that particular time, yet again, he was in the

10   car.  That right there was something that someone else -- they

11   stuffed it in his seat.

12            This is something he discusses with me.  He will tell

13   me the truth, but he's not going to do it on the streets.  When

14   it comes to the streets, that's what they do; they have their

15   code of silence.

16   **Q.**  When he was 15, he was referred to the South Bend police

17   for a battery.  Was that before or after the ADHD diagnosis?

18   **A.**  No, his ADHD diagnosis was diagnosed at a young age.

19   **Q.**  And this resisting arrest conviction as an adult at age 19,

20   his first adult conviction, that was after the ADHD diagnosis.

21   Was he --

22            MR. STEVENS:  Your Honor, that charge was dismissed,

23   and I would object to characterizing it as a conviction.

24            THE COURT:  All right.  Characterize it to what it's

25   reported as.

1   BY MR. HAYS:

2   **Q.**   The possession of marijuana and resisting arrest charge,

3   the possession of marijuana that he was convicted of, was he

4   living at home with you at the time?

5   **A.**   Yes.  But if you notice, all his crimes that you're

6   speaking of, he wasn't in my home at the time.  He was out and

7   about.

8   **Q.**   And the invasion of privacy when he was also 19, same

9   thing?

10   **A.**   What invasion of privacy?

11   **Q.**   It was a charge from an event that occurred on April 30th

12   of 2010.

13   **A.**   At what location?

14   **Q.**   I'm sorry?  I didn't quite hear you.

15   **A.**   What location?

16   **Q.**   Sorry.  The report I'm looking at doesn't have a location.

17   **A.**   Well, I'm unaware --

18   **Q.**   So you don't know if he was living at home at the time?

19   **A.**   I'm unaware of that, but my son been at home with me since

20   he was born.

21   **Q.**   Was he living at home with you also when he caught the two

22   cases that are currently pending in the St. Joseph Superior

23   Court?

24   **A.**   Those is driving while suspended; is that what you're

25   talking about?

1    **Q.**   No, I don't think so.  Theft and -- both theft.

2    **A.**   That's something new to me.

3    **Q.**   Okay.

4    **A.**   But, yeah, he was living at home.

5    **Q.**   And when he was -- he was on probation in Fulton County?

6    Do I have that right?

7    **A.**   Uh-huh, Rochester.

8    **Q.**   Were you aware of that?  Rochester.  Were you aware --

9    **A.**   Yes, I took him back and forth to court.

10   **Q.**   And you understand they have a hold lodged against him; are

11   you aware of that?

12   **A.**   What do you mean "a hold"?

13   **Q.**   A hold means that they have to be notified before he can be

14   released.  Are you aware of that?

15   **A.**   I am now.

16   **Q.**   Okay.  Again, he would have been living at home with you

17   when that occurred?

18   **A.**   Yes.  That's what mothers do.

19   **Q.**   Finally, are you aware of the nature of the threats that he

20   posted?  Have you seen them?

21   **A.**   I -- the reporter showed it to me.

22   **Q.**   Okay.  Specifically, the one where it's an image of a

23   police officer with a bullet going through his head, and he

24   posted on it -- or it said, that he posted, "SPEAK TO COPS IN A

25   LANGUAGE THEY UNDERSTAND."

```
 1          Do you consider that debating?

 2    A.   There was a lot of Facebook posts that said a lot like

 3    that, so, yeah, I found those to be a debating.  I don't say

 4    that I will agree to something like that, but it is something

 5    that you should discuss with your children so that they know

 6    how to react and respond to their emotions because everyone has

 7    them.  Everybody gets angry.  God got angry.  Everybody gets

 8    sad.  Everybody gets happy.  Whatever the case may be.  It's

 9    when you interact with them.

10          So I don't find nothing wrong with having a discussion

11    about something that you feel upset about.  It all started with

12    the young man that got killed, the (indiscernible) kid.  That's

13    how the whole debation first started.  And then other postings

14    with other people putting something else on there made him

15    react and have that portion of a debation, which added on to

16    other posts that had some similarities to it, and we debated

17    about that as well.  We was also debating about children

18    being -- holding guns.

19    Q.   So that was essentially his way of trying to express his

20    anger, his disgust with police officers?

21    A.   You know, as children do and as they grow, you have your

22    time and moments when your children become rebellious.  I'm not

23    saying my son is perfect.  All I'm saying is he's just human.

24    So he arrived with the same emotions as everyone else had and

25    about the same age they do.  I tried to keep him a productive
```

 1   citizen so he's not really out there doing a lot of crimes or

 2   haywire or big, giant things that -- you know, matters we're

 3   hearing and being in a situation like this.

 4          I do prefer my son to be at home.  I am a mother, and

 5   I do try to stay in my children's lives.  So that's why we sit

 6   and debate and discuss things such as that matter because if it

 7   bothers them -- if you seen something like that where your

 8   children said something to you like that, and they said, Dad,

 9   what do you think of -- what's your opinion about this, that's

10   how it gets started.

11          And I classify it as a debation because we're all

12   putting our emotions in it and we're all speaking about it.  No

13   one gets angry.  No one is going off and hitting someone or

14   touch someone.  He had no intentions of going outside that

15   house.  I wasn't even going to let him.

16   **Q.**   He was expressing his anger though, wasn't he?

17   **A.**   He was just expressing his emotions.

18   **Q.**   The emotion being anger?

19   **A.**   Yes.

20          MR. HAYS:  Thank you.  Nothing else, Judge.

21          THE COURT:  All right.

22          Redirect?

23                       REDIRECT EXAMINATION

24   BY MR. STEVENS:

25   **Q.**   You're familiar with the feelings in the African American

 1  community about the recent news events, the several shootings,

 2  the incident in Dallas.  A lot going on, right?

 3  **A.**  Yes, a lot going on.

 4  **Q.**  There's a lot of anger in the community, right?

 5  **A.**  It is.

 6  **Q.**  A lot of distrust with the police?

 7  **A.**  It is.

 8  **Q.**  And a lot of discussion about that distrust?

 9  **A.**  I have a lot of discussion about that.  I'm one actually to

10  whom agree that, you know, police officers are there to do

11  their job.  I have high respect for them, authority.  I even

12  let them know that when they came out.  Although I was being

13  emotional, I never ever got angry towards them.  Nothing was

14  directed towards them, but I expressed my anger then too.

15          I was angry at my son for taking what we had at home

16  and putting it to the public.  It wasn't for the public to know

17  what we were discussing.  He just shared it because that's what

18  he do.  You know, everybody has this Facebook thing, and they

19  do it for the likes and they do it for the popularity.  He's

20  just a popular Facebook person, and all he's doing is

21  entertaining.  It's for the entertainment.  That's it.  It's

22  not going no further.

23  **Q.**  But anger gets expressed in sometimes inappropriate public

24  expressions such as the image of the police officer, right?

25  **A.**  There's a lot of people who express themselves in an angry

1  tone towards the police because they feel some matters are

2  unfair.

3  **Q.**  But they're not out committing violence?

4  **A.**  No, I don't see the ones to whom have -- that I have seen

5  have actually went out there and reacted or responded to

6  something that they said on Facebook or have these little memes

7  that they make up or share from someone else's page and put it

8  on their page.  None of them I've seen react to it.  Some don't

9  have that problem.  We don't do that.

10         MR. STEVENS:  That's all I have, Judge.  Thank you.

11         THE COURT:  Anything else?

12         MR. HAYS:  May I have one moment, Judge?

13         THE COURT:  You may.

14         (Discussion held off the record.)

15         MR. HAYS:  Nothing further, Judge.  Just argument

16  whenever Your Honor is ready.

17         THE COURT:  You may step down.

18         Anything further, Mr. Stevens?

19         MR. STEVENS:  Just one thing further with regards to

20  the pretrial services report.

21         THE COURT:  You may step down, ma'am.

22         THE WITNESS:  Okay.

23         THE COURT:  I'm sorry.  I didn't hear that,

24  Mr. Stevens.

25         MR. STEVENS:  The assessment of nonappearance in

 1  paragraph 5 on page 6 of the pretrial services report, the

 2  government alluded to this, Fulton County placed a hold against

 3  the defendant.

 4       There was a charge in Fulton County for driving while

 5  suspended, and I wanted to run that down.  I first got the jail

 6  booking records and they show no hold at all against

 7  Mr. Beavers from Fulton County.  I contacted Mr. Oviedo, U.S.

 8  probation officer, and he advised me that he got a paper from

 9  the jail with the word "hold" handwritten on the records.

10       THE COURT:  When you say "jail," St. Joseph County,

11  not Fulton?

12       MR. STEVENS:  St. Joseph County Jail, not Fulton

13  County.

14       THE COURT:  Okay.

15       MR. STEVENS:  As I said, I pulled the Fulton County

16  records.  That case is closed.  There is no record of any

17  warrant being issued on that.  I called the jail myself.

18  St. Joe County Jail says they have no hold on Mr. Beavers.  I

19  then asked the U.S. Marshals Office, and they contacted the

20  jail.  The report I got back from the marshals office is that

21  there is no hold on Mr. Beavers.

22       None of the St. Joe County cases that are pending --

23  the theft case, he appeared on summons, and so there was no

24  bond issued.  The other case, he did post bond and was at

25  liberty at the time he was arrested on this case.  So there are

1    no holds of any kind against Mr. Beavers that would prohibit

2    his being released on bond should this Court determine that a

3    bond is appropriate.

4         So with that correction to the pretrial services

5    report, I would rest our presentation.

6         THE COURT:  All right.  Do you agree, no holds?

7         MR. HAYS:  According to Mr. Oviedo, he said it was the

8    handwritten word "hold," so apparently that is inaccurate.  It

9    is not a hold.  So, yes, for purposes of this, I'll agree.

10        THE COURT:  At least as to the Fulton County matter?

11        MR. HAYS:  Yes.

12        THE COURT:  Okay.  Anything further, Mr. Stevens?

13        MR. STEVENS:  Nothing further, Judge.

14        THE COURT:  Okay.  Argument.

15        MR. HAYS:  Thank you, Your Honor.

16        Judge, Section 3142 of the detention statute calls for

17   the Court to address a series of factors.

18        First, of course, and foremost, is the nature and

19   circumstances of the events charged.  One of the subfactors, if

20   you will, is whether or not the crime is a crime of violence.

21   Even after the very stringent holding of *Johnson*, interpreting

22   the ACCA, even under that very strict definition -- which, by

23   the way, would probably not apply to the bail detention

24   statute -- it would still be a crime of violence because this

25   crime has a threatened use of physical force against the person

 1   of another.  That's one of the ways that a crime could be

 2   considered a crime under that statute.

 3        My point is simply to draw attention to the fact that

 4   the nature of the crime was extremely violent.  While, no, he

 5   didn't have gasoline or a handgun in his possession at the

 6   time -- and I'll concede that, of course -- that doesn't change

 7   the fact that this was a violent crime under even the most

 8   stringent definition.

 9        Further, Your Honor, I noticed from the evidence

10   before the Court that even when his Facebook friends told him,

11   essentially, calm down your threatening posts, or words to that

12   effect -- and it wasn't those exact words -- he continued to

13   make those threatening posts over a period of a couple of days.

14        Even after Facebook took down the most offensive of

15   those posts, the last one involving the image of a police

16   officer and the phrase "SPEAK TO THE COPS IN A LANGUAGE THEY

17   UNDERSTAND," he reposted it after Facebook had taken it down.

18        Second, the weight of the evidence against the person.

19   Here, the weight of the evidence is rather strong.  It's very

20   clear he made the posts.  No one's disputing that.  He

21   confessed, and I think it's clear from the questions and the

22   comments during this hearing that's not going to be the

23   defense.

24        At best for the defense, the defense will be some sort

25   of a legal, technical defense based upon the mens rea or what

1    *Elonis* may say, et cetera.  It doesn't give him a great deal of

2    wiggle room, if you will, and so I would suggest to the Court

3    that, in fact, the weight of the evidence against him is rather

4    strong.

5           The third factor, the history and characteristics of

6    the person, specifically, the person's character.  His many,

7    many contacts in the past with the criminal justice system,

8    including a prison term for narcotics, misdemeanor convictions,

9    pending misdemeanors, probation, probation that failed, and a

10   stretch in prison.  That's not a person whose history and

11   characteristics suggest that he is either a good risk for bond

12   or that he is not a risk should he be released -- that he would

13   be a risk to the safety of the community.

14          He failed on probation.  He failed to comply with

15   probation when they ordered drug treatment.  His employment

16   history is not strong.  He's currently unemployed.  He only

17   worked his last job for about a month before he was arrested

18   and didn't go back.  Maybe he's trying to go back now, and

19   that's wonderful.  I wish him the best should he be released,

20   but he wasn't kept.

21          He doesn't appear to have any significant financial

22   ties to the community, though, concededly, of course, his

23   family ties to the community appear quite strong as is

24   evidenced by his mother's testimony here today.

25          He has a history of drug abuse and failing to

1    participate in the court-ordered treatment while on county

2    probation, and that's important, because he didn't obey with

3    that Court's instructional requirement that he comply with that

4    Court's order.  He didn't obey that Court's order that he get

5    the drug treatment that he was ordered to do.

6          Another factor under the history and characteristics,

7    by statute, asks whether at the time of the current offense or

8    arrest the person was on probation, parol, or other case.

9    Well, he was on probation, as we've heard, from Fulton County,

10   notwithstanding the fact that that hold appears to not exist.

11   And, also, he was on release from two pending cases in

12   St. Joseph County when he was arrested on this case.

13         Finally, the nature and seriousness of the danger.

14   Judge, given the nature of this offense, I think that the

15   evidence is clear that the danger he poses is serious.  He has

16   threatened to burn down buildings -- that was the first post --

17   to burn it down, and there was other graphic language which I'm

18   not going to repeat in this setting, Judge, but Your Honor is

19   familiar with it.  And he posed a serious threat when he

20   threatened to kill police officers with that post.

21         I can't see how anyone, a police officer or anybody

22   else, would not see that as a serious threat.  I can't see how

23   anybody would look at that and not think that he was trying to

24   threaten.  Did he plan on fulfilling that threat?  It doesn't

25   sound like it, but that's not the standard that has to be

1    addressed at this point.

2           Finally, Judge, I would urge the Court to follow the

3    probation officer's recommendation.  They're the experts in

4    this.  They have the best handle on what they can do to

5    reasonably assure his appearance and to ensure the safety of

6    the community.  And it's clear, Your Honor, from the probation

7    officer's recommendation that they don't believe they can

8    adequately supervise him.

9           Thank you, Judge.

10          THE COURT:  Very well.

11          Mr. Stevens, argument.

12          MR. STEVENS:  Judge, the government -- well, first

13   off, I would agree that the presumption does not apply in his

14   case.

15          The government during questioning of Mr. Beavers'

16   mother --

17          THE COURT:  Do you also agree with the government that

18   this is a serious offense?

19          MR. STEVENS:  I would agree, Judge, that this is a

20   serious offense.  I'm not sure it meets, post-*Johnson*, the

21   legal --

22          THE COURT:  Do you think this is a serious offense or

23   a mere defendant exercising his First Amendment constitutional

24   right?

25          MR. STEVENS:  Well, certainly, that's going to be an

```
1    issue for a jury, as to whether this is true threats or whether
2    it is, however crudely put, First Amendment expressions of
3    thought.
4         I'm not going to concede that he had either the intent
5    specifically to make a threat or the intent to -- certainly the
6    intent to carry out any threats.
7         THE COURT:  Well, you signaled another question I had.
8    Isn't there a difference between the intention to make a threat
9    and the intention to carry out that threat?
10        MR. STEVENS:  There is, and the statute prescribes
11   punishment for individuals who intentionally and knowingly make
12   a threat that they expect will be perceived as a true threat.
13        THE COURT:  But can you make a threat, intending it to
14   be a threat, without having the capacity to carry it out and
15   still commit an offense under 18 U.S.C. 844(e)?
16        MR. STEVENS:  The statute doesn't require an intent to
17   carry out the threat.  I certainly concede that.
18        THE COURT:  So that's a distinction?
19        MR. STEVENS:  It is a distinction.
20        THE COURT:  So whether he had the gasoline or the
21   pistol and had the capacity to carry out what he posted is not
22   relevant to whether he made the threat to do that?
23        MR. STEVENS:  Well, Judge, I think the possession of
24   those items certainly would be evidence of --
25        THE COURT:  Well, that would make a stronger case for
```

1    the government, conceded, but it doesn't destroy the case by

2    the absence of that evidence?

3         MR. STEVENS:  Well, absence of evidence is always,

4    Judge, a --

5         THE COURT:  Well, what I'm trying to focus on is the

6    threat versus the capability of carrying out the threat, which

7    is something else.

8         MR. STEVENS:  And I'm not arguing that he had either

9    the capability or the intent to carry out a threat.  All I'm

10   arguing is lack of evidence is something -- lack of evidence of

11   intent to carry out a threat is certainly something that can be

12   considered, and I concede that's an argument that a jury is

13   going to have to decide at some point.

14        But I think it's significant that -- regardless of any

15   evidence that he made these Facebook postings, the Court has to

16   consider whether he presents a danger to the community; and

17   that lack of evidence, I would argue, is some evidence for the

18   Court to consider on the issue of dangerousness.

19        THE COURT:  Can the Court consider as a danger to the

20   community the very postings that he made?

21        MR. STEVENS:  Judge, the Court can consider,

22   obviously, anything the Court wants to consider.

23        THE COURT:  Well, isn't that pretty powerful evidence

24   before the Court of a danger to the community, is the postings

25   that he admits he made?

```
 1          MR. STEVENS:  I would argue, Judge, that that in and

 2    of itself is not evidence of danger to the community.

 3          Getting back to the --

 4          THE COURT:  So lighting a match and throwing it upon

 5    dry tinder is not necessarily a danger to the community?

 6          MR. STEVENS:  That's a physical act, Judge, with the

 7    intent that the match ignite the tinder and --

 8          THE COURT:  And one assumes the reasonable

 9    consequences of the act, that you intend that tinder to light

10    when you call for it to be lit.  When you strike the match, you

11    want to light it up.  When he calls out for others to come and

12    burn down the city, I take him at his word.

13          MR. STEVENS:  Judge, we're talking about a difference

14    between speech and physical action.

15          THE COURT:  Yes, but the First Amendment is not

16    absolute.  Do you agree with that?

17          MR. STEVENS:  I agree that one can't -- as the

18    proverbial saying goes, one can't scream fire in a crowded

19    theater.

20          THE COURT:  And the gathering last Saturday was that

21    crowded theater.

22          MR. STEVENS:  Judge, the postings on Facebook are a

23    far cry from standing in front of a crowd and inciting a crowd

24    to riot.  And let's look at the reality, Judge.

25          THE COURT:  In today's technological world, I'm not
```

1   sure how much of a difference that is.

2          MR. STEVENS:  Judge, let's look at the reality of what

3   life is like in the United States today.

4          THE COURT:  That's not before the Court here.

5          MR. STEVENS:  It is before the Court, Judge.

6          THE COURT:  I've already found probable cause, so save

7   that argument.

8          MR. STEVENS:  Judge, what you're saying is that speech

9   by virtue of the Internet becomes a call to violence.

10          THE COURT:  No, no, no.  What I say -- I will say

11   clearly -- the Internet and the devices used to access the

12   Internet are a megaphone to communicate to a broader audience.

13          So that's what I'm referring to by the technology, is

14   that when everyone is monitoring their postings and

15   communicating, you're shouting that out into that crowded

16   theater.  That's what I'm saying.

17          MR. STEVENS:  And, Judge, if you look at the postings

18   on Facebook today, Facebook is filled with people who are angry

19   over the actions that have taken place by a few bad police in a

20   few cities but which the African American community is taking

21   as evidence that there is a fundamental unfairness that is

22   going on that affects the African American community.  And

23   that's a matter of major discussion in the African American

24   community in whatever form it takes.

25          Facebook is nothing more than a social media where

 1    people are expressing that anger.  That's a far cry from, as I

 2    said, standing in front of a crowd and urging people to pick up

 3    rocks and throw them at police.

 4            THE COURT:  Anything further, Mr. Stevens?

 5            MR. STEVENS:  Absolutely, Judge.

 6            The government made a great deal of the Swanson

 7    Elementary School age seven referral when questioning

 8    Mr. Beavers' mother.  That was a truancy.  He received a

 9    warning the same day.

10            THE COURT:  You can confine your comments to his adult

11    record.  We need not go back that far.

12            MR. STEVENS:  I'm sorry, Judge?

13            THE COURT:  You can confine your comments to his adult

14    record.  I'm not going to look beyond that.

15            MR. STEVENS:  All right.  Mr. Beavers has certainly

16    several convictions for drug offenses; a possession of

17    marijuana, a felony possession of heroin, which is serious, a

18    possession of marijuana, and he has carrying a handgun without

19    a license, an invasion of privacy misdemeanor, and a disorderly

20    conduct.  The rest of his convictions are all driving while

21    suspended.  He has no convictions for any violent acts.

22            His mother says that as a child he was not violent.

23    Living at home, he was not violent.  She doesn't believe he

24    presents any threat to anybody.

25            THE COURT:  Now, I'll go with you on some, but I think

1   you're pushing it too far, to say that there's no charges

2   infecting violence.  The way I count it up, there were at least

3   five charges that it seems were violent.

4         In 2010, a strangulation, felony.  That seems to be a

5   violent matter, felony and strangulation.  Also, battery, a

6   misdemeanor.  We have other charges involving intimidation.

7   I'm not exactly sure what it is, but it's a felony, so that

8   must be something by words or deeds that caused someone to be

9   intimidated sufficient to be a felony.  We have other --

10   criminal mischief.  I'm not exactly sure what that is, but we

11   also have other batteries.  So there are charges involving

12   violence, including a felony charge.

13         MR. STEVENS:  And, Judge, as I said, not a single one

14   of those resulted in any conviction by any court, any judge --

15         THE COURT:  Understood, but I'm entitled to consider

16   charges as well as convictions.

17         MR. STEVENS:  Judge, you have nothing before the Court

18   as to the circumstances of any of those other than he was --

19         THE COURT:  Well, however, Mr. Stevens -- I understand

20   what I'm supposed to do.  You know what I'm supposed to do.  I

21   know what you're supposed to do.  We don't have to give each

22   other lessons on that.  However, when you say that there's

23   nothing in his record to suggest he's violent, that's

24   overstating it.

25         MR. STEVENS:  I don't believe I said that, Judge.  I

 1    said he has no convictions for any violent acts.

 2         THE COURT:  All right.  I will give the point of no

 3    convictions, but I can look beyond that to see what are the

 4    charges to see if there's evidence of violence to support the

 5    question, which the statute allows me to consider his

 6    character.

 7         MR. STEVENS:  Without looking at the probable cause

 8    affidavit in those cases, there's nothing more than a naked

 9    charge and a naked dismissal.

10         Judge, this is an individual, as far as risk of

11    flight, who's lived all of his life in South Bend.  He has

12    lived at home with his mother.  He's never traveled for any

13    significant time outside the state of Indiana.  In fact, I

14    don't believe he's ever actually even been outside the state of

15    Indiana.  Fulton County is the farthest he's been.

16         He has worked, although he wasn't employed at the time

17    of his arrest.  He does believe he has employment, and he has

18    certainly strong ties to the community through his family.  He

19    has no place to go; no way to get there; no funds to leave the

20    area.  He presents absolutely no risk of flight.

21         I've already argued the danger to the community.

22         So I would ask the Court to place him on electronic

23    monitoring with his mother as third-party custodian.  He's

24    willing to surrender his computer so he doesn't have access to

25    Facebook and would agree to that as a condition of release.

1          I think those are reasonable.  I think they comply

2     with the format.  The presumption does not apply and that would

3     be a reasonable condition of release in this case.

4          THE COURT:  All right.  Thank you, Mr. Stevens.

5          Mr. Hays, any rebuttal?

6          MR. HAYS:  Nothing further, Your Honor.  I stand on my

7     earlier comments and the facts.

8          THE COURT:  All right.  Then the matter is before the

9     Court for resolution.

10         As counsel both agree and the Court concludes, the

11    statutory presumption does not apply in this case, which simply

12    means that the government is seeking the detention of the

13    defendant pretrial on both prongs of the statute, which is

14    flight risk and a danger to the community.

15         The standard that the Court must find under flight

16    risk is a very small standard, a preponderance of the evidence.

17    However, danger to the community, the Court must be convinced

18    by clear and convincing evidence that the defendant would pose

19    a danger to the community.

20         By virtue of their proffer, the United States

21    indicates that they have a strong case.  They believe in the

22    legal sufficiency of the charging document as well as, as was

23    brought out at the pretrial -- or, rather, the detention

24    hearing, the defendant's admission that the charges -- rather,

25    the postings were his but that he was angry and it was -- how

1    shall I put it in my phrase -- mere words, but he doesn't deny

2    that the postings were his.

3          If convicted as currently charged, the defendant is

4    looking at, by the government's calculations, 27 to 33 months,

5    which, as cases come before this Court, is not necessarily a

6    long time, but that doesn't minimize the seriousness of the

7    offense.

8          I asked defense counsel if he believes this to be a

9    serious offense.  The government believes it's a serious

10   offense, and the Court believes it's a serious offense,

11   particularly in light of what has been going on not just

12   locally but nationally.

13         The strength of the government's case rests on the

14   postings that the defendant made and show, in the Court's view,

15   some very serious threats.  Whether he had the capability to

16   carry out those threats is not germane.  It's, in the Court's

17   view, as to whether he met the statutory requirement, and 18

18   U.S.C. 844(e) indicates a threat to kill, to injure, to

19   intimidate any individual or to destroy any building by fire or

20   explosion.  A threat to do that, in my view, meets the

21   standards.

22         As indicated in the affidavit, his postings couldn't

23   be more clear on that.  I will read from one:  [Blank] it, I'm

24   ready to riot, and if you don't want no violence stay the hell

25   away from me.

1          Then in all caps:  HELL NO WE WON'T GO.

2          Then:  Let's burn this down, meaning the city.

3          He's indicating if you don't want violence, stay away

4     from me.  That suggests he is violent.

5          Another posting shows a riot in progress and postings:

6     When y'all ready I'm just an inbox or phone call away.

7          Another posting, again:  Just look at what happened --

8     I'm paraphrasing it -- in the peace march -- but look what

9     happened in Baltimore after they started rioting.  You ain't

10    heard nothing about no deaths there from police, have you?

11    Don't worry, I'll wait, just tear this up, come together and

12    burn this down.

13         Clearly a reference to a riot, referencing Baltimore,

14    and related to police brutality and its aftermath, and then:

15    Don't worry, let's burn this down.

16         And then the most offensive is the posting that

17    Facebook took down and the defendant put back up, which was a

18    visual where there was a police officer with a shield in front

19    of his face and a gun in front of his face, and it's clear he's

20    being shot.

21         Those are threats in this judge's opinion, and it's

22    clear and convincing.  It's not probable cause.  And it is the

23    proverbial "yelling fire" in a crowded theater, the theater of

24    this community, that is tinder to dry, ready for a spark to

25    ignite it.  And this defendant, in the Court's view, did that.

1    Not merely engaged in polite discourse and debate, but an

2    attempt to cause others to follow suit, and I think that's

3    prohibited by the statute and not protected free speech under

4    the First Amendment.

5        So I find that the government has a strong case and

6    that the defendant does present by clear and convincing

7    evidence a danger to this community, and he will be detained

8    pending further proceedings.

9        Anything further, Mr. Hays?

10        MR. HAYS:  No, Your Honor.

11        THE COURT:  Anything further, Mr. Stevens?

12        MR. STEVENS:  Nothing further, Your Honor.

13        THE COURT:  That will be the order.

14        The defendant is remanded.

15        Thank you, Counsel.

16        (Proceedings concluded.)

17
                              *CERTIFICATION*
18

19        I, JOANNE M. HOFFMAN, Federal Certified Realtime
     Reporter, certify that the foregoing is a correct transcript to
20    the best of my ability taken from the FTR ELECTRONIC RECORD of
     proceedings in the above-entitled matter.

21

22                    *Joanne M Hoffman*

23    _____     August 24, 2016
                  Certified Realtime Reporter
24                United States District Court
                  Northern District of Indiana
25                South Bend Division